Council, you may proceed. Good morning, Your Honors. My name is Tom Barham, and I represent Michael Clapper and his minor daughter, Summer Clapper. As you know, we're appealing the summary judgment motion granted against Mr. Clapper. We're also seeking to have the court's decision denying plaintiff's motion for partial summary judgment against Officers Barrientos, Ponce, and Ramirez reversed and having the matter remanded for trial and damages against those three defendants and on the merits as to the remaining defendants. And finally, we're also asking if those are successful, that is the reversal of the summary judgment motion, that the court's order denying the amendment of the complaint, that is filing of the first amended complaint, be permitted and that we go to trial on that complaint. I know that you've been very active in your questioning this morning, so I presume that you have some pointed questions for me. I have prepared statements, but if there are areas that the court has concerns on, I would welcome those questions. Let me ask you about, let's just zero right into the incident. Yes, sir. Your client, Mr. Clapper, enters his apartment building and goes to his apartment. And eventually, minutes later, the police are in the building looking for the drivers of the vehicle that was involved in the chase. Yes. I gather it's your position that what occurred at the door, the steel door, both on the apartment, I guess at that, at the apartment, that what happened there, that there's just simply a dispute of fact. Yes, Your Honor. Not only is there a dispute of fact, but somebody's lying. I don't think there's any way to cut around that. Officers, Ponce Ramirez, contend that the door, the metal door with the small perforations, which you have copies of the photograph of that door, it was Exhibit T in the summary judgment motion. But they contend that that door was wide open. When you read Officer Barrientos' arrest report, he contends that Clapper was hiding behind the metal door. You have Exhibit 39 in the record also, which is a photograph taken of the door without the metal security door in place. I wanted to make sure that you're aware that that was taken after management of the apartment. Anyway, that particular photograph shows the door ajar two inches, which is what Mr. Clapper claimed, that it was open, but that the metal door was shut. The officers contend that Mr. Clapper's back was up against the wall, which would be just to the right of the door opening, and that they were able to see him breathing heavily through a four-inch aperture. I want you to imagine for a moment the view that an officer would have through that four-inch aperture. It's almost like a fan. At four inches, you'd have to suspend disbelief in order to believe that they could see anything other than a portion of his arm. There is such a dispute on that pivotal issue, as you pointed out, that I don't see how the trial court reached that as not a trial issue. What about the issue of consent? Because even if there was a problem there, did he consent to their coming in? I don't think that the case law supports that there is consent. What the defendants have contended is that this was akin to a knock and talk. Mr. Clapper's version of the events are that he went to the bathroom after he got in, put down the milk and the groceries that he had with a receipt in the package, and then when he heard this banging on the door, before he put the milk away, he went to the door, opened the interior door. The exterior metal screen door with a small perforation was deadbolt locked. At that point, he sees two figures standing outside the doorway on either side, and he hears someone say, police officer, open the door. He unlocks the door, steps back. Officer Ponce Ramirez then opened the door, stepped in, asked him where he's been. He tells him he's been to the market. They then handcuffed him, and this is important. In Variantos's report, he says they detained him. Well, of course, when they got an attorney and learned that they couldn't do a detention inside a person's home, then it transmogrifies to an arrest inside, but now they have consent. It's a knock and talk, and it's one of these migrating versions of fact that I think a jury is well suited to decide. Well, what about the totality of circumstances? This is in the context of a helicopter that's sitting right above that reports to these officers that the suspect got into this particular building on the run, and a description, I don't know how easy it is to tell the difference between a white Hispanic and someone who's not a white Hispanic, but I have some problems with looking at this with too close a microscope because all of this other stuff is going on. This suspect is breathing heavily, and it's in the building, and they're satisfied that the description is reasonably close to the description they got. Why can't we take a look at all of that? I think you can, Your Honor, but the problem with using a term such as totality is it assumes too much. First of all, as I indicated, when you proffered that he's breathing heavily, well, Mr. Clapper submitted a declaration saying by the time the officers came in, I was not breathing heavily. The question that was asked of him at his deposition is after he got back, or after he ran for a period of time from the point when he was at La Vida and Laguna, and this is after the pursuit passed him, that he ran the short distance, which is less than 100 yards. He stopped to talk to Mrs. Zavia for a moment. Then he went into his apartment, but he was not breathing heavily when the officers were there. So that is contradicted. As far as the officer, and you're talking about Officer Cornell, the tactical flight officer in the helicopter, the evidence is that the helicopter was in motion. It was at 300 feet above the ground minimum. The federal aviation regulations require a plane to be safe at power-off distance, so it's probably closer to 500 feet, but he concedes at least 300 feet. I would submit to you that if you looked down from 300 feet, or if you saw me at the end of a football field, and you were looking at me from a bird's-eye view, you would see the top of my head. I would just point out, and I think it's very instructive, the case... What we're talking about here is probable cause, reasonable belief. Absolutely. And it has to be, and the courts are very clear on this, it has to be something that would be credible and reasonable for an experienced officer to believe in order to arrest this person. There is scant description of the person. Male, Hispanic, white shirt. In fact, Mr. Clapper is wearing a short-sleeved shirt. If you look at the video, and one of the things we had asked for was to submit to you a DVD of the KCAL, and the channel, KCAL is nine, and channel 11 is Fox. They filmed this whole thing, and we never did get an order from you. We had submitted it and said the panel would rule on it, and we didn't get a ruling. But the video is very, very compelling. What it shows is a small man who turns out to be George Duran, the registered owner of the car, who's 5'8", according to the warrant that was out for his arrest. But the size was not determined before or after they arrested him. Well, Mr. Clapper is 6'5", Your Honor, so when you approach the person, you can see he's 6'5". Yes, but there was some evidence that the suspect was 5'8", or something like that. Yes, that's... Later after the arrest, wasn't it? Well, Your Honor, it was. It was discovered... The man from the helicopter, did the man from the helicopter indicate how tall he was? No, no. That's part of the problem in the case is that there is this very scant description of the person, and we've cited Lambert and other cases along that line. It's a rather vague description. Yes, Your Honor, and I think there's even a more compelling case that we just dealt with in a footnote, and that's Grant v. City of Long Beach. And in Grant, this is a 2002 Ninth Circuit case, the court talked about the reliability of identification was questioned, and they were citing another case, because the robber was seen only two times, both from 20 feet away and only for a few seconds. And that was in affirming a judgment in favor of Mr. Grant, who was thought to be the Belmont Shores rapist. Here we have from 300 feet away, and I can give you a hypothetical and say, well, okay, now at 1,000... A few seconds, wasn't it, that the helicopter was observing this fleeing car? He's observing the fleeing car for, I think, 19 or 20 minutes. He observes the people out of the car for less than five seconds. And we had that timed, and it's on the DVD that we had pro-offered, but it was returned to us by the clerk's office. Now let me come to another aspect of the case. Let us assume, for the sake of argument, that we were to say that this is what we think is a close case, but probably on balance, there was not probable cause. Why would there still not be qualified immunity on the theory that it was a close case, and it was not clearly established that in this sort of a situation, as far as the arresting officers knew, that it was impermissible for us? Because I gather that under the second aspect of the inquiry, you don't look to see what, in fact, was happening, but you look to see whether, to reasonable police officers, they would have known at the time they made the arrest that what they were doing was illegal. That's the standard, isn't it, for qualified immunity? Yes, Your Honor, it's the two-part... But what are the digital decisions that establish that what happened here was clearly not legal? Well, Your Honor, I would point to three cases that are in our brief. Walden v. Merriman, which is a Ninth Circuit case from 1988. Fuller v. M.G. Jewelers, which is a Ninth Circuit case from 1991. And most importantly, the recent case of Vroom v. Bogan, which is a Ninth Circuit case from 2003. The three of those cases stand for the proposition that qualified immunity is not available to officers if a further investigation, given the totality of the circumstances they face, could have exonerated the person. And there's also a case I didn't cite, but your question reminds me of this. It's a recent Eleventh Circuit case that is entitled Kingsland v. City of Miami. And in Kingsland, the court held that if officers fabricate circumstances to create probable cause, there is no qualified immunity, which is a commonsensical approach. And that particular case distinguishes the Ninth Circuit case of Cunningham v. Gates, in which the court said there wasn't a scintilla of evidence that there was fabrication. Here, if you go back to what Justice or Judge O'Scanlan was talking about a moment ago, and this was the totality of the facts and circumstances facing the officers, if they fabricated the circumstances of the door being open in order to say, well, he was up against the wall and he was breathing heavily, there's no qualified immunity for that. And he could have been cleared very simply. He had just come back from the market. According to both he and the woman that was in the apartment, there was milk in the sack, the grocery sack. There was a receipt in there. He said, I've just come back from the Pioneer Market. That was two blocks away. There was actually 43 officers present. Our brief says there's an agreement there was 21, but actually it was 43, including three sergeants that were at the scene. The officers reportedly told Mr. Clapper that it wasn't their policy to go back and check on it. He said, the security guard can vouch for me. The person that I bought it from can vouch for me. Mr. Clapper was a person who was from Chicago. He and his wife had moved here. They had just had a brand-new baby. He didn't drive. He didn't have a California driver's license. He was employed as a dishwasher by the Hard Rock Cafe. They lost everything as a result of this. And the police acted irresponsibly. I don't think under the circumstances of this and the case law in this circuit, they're entitled to qualified immunity. And going back to Judge Scanlon's question about the helicopter and the totality, is it reasonable for an officer from 300 feet up to say, oh, yeah, I can positively identify him? I think when you read the Grant case, you're going to find that when you apply the touchstones that are set forth in Grant, it's not even close. That was a totally irresponsible thing to do. I know that you and Judge Scanlon were in the military some time ago. I don't know if you had the privilege of flying in helicopters. I personally was a helicopter pilot in the Army. I was just a passenger in the Army. But, you know, I know that you do a great deal flying, Judge Friedman, coming here from Washington. But imagine yourself on short final coming into Washington National and the plane is at 300 feet. You look down for four seconds. Can you identify somebody on the ground and you see them two minutes later? It's a rhetorical question. It's absolutely ridiculous. Put them up 500 feet. Put them up 1,000 feet. At some point, it becomes even more rhetorical and ridiculous. How do you claim that he testified that he had a binocular? That was after Mr. Clapper was brought outside and he was directed to look up. This was such an overly suggestive lineup. And, again, Grant goes into that. So I think that although we kind of minimized Grant in our reply brief, putting it down as a footnote, my partner wrote that, the brief. I'm not trying to denigrate her. She's got a family situation. That's why I'm arguing this. But in rereading the cases for the presentation this morning, it seemed to me that Grant is a very, very strong case for a plaintiff. I'd like to reserve the balance of my time, if I may. You may do so, counsel. Good morning, Your Honors. Amy Field on behalf of defendants and appellees. I think I'd like to start with the Grant case. I was also looking at that case. And I think Grant is distinguishable from the facts in this case, because in Grant the victims slash witnesses were making an ID, but you didn't have the additional factor of the close proximity in time and place. It wasn't just that Mr. Clapper was identified by the helicopter pilot after a, you know, quick view from up above. He was found less than three minutes after the suspects fled into the building, and it's undisputed that this is the building the suspects were in. They went in and nobody was seen coming out. So I think that additional factor is very important. Counsel, let me just make a comment. I think this is a very close case. What really bothers me about it, and it's probably not quite pertinent to the issue, but you held this person for 41 days when you knew the same night that the driver of that car had an address in that building. I just think that's indefensible. Well, I will say what we knew, or what the police knew, was that the registered owner of the car had an address in the same building that Mr. Clapper lived in. And I think Plainiff has made that argument somewhat. I don't think it's been the primary focus. But his read on that evidence was that a reasonable view or interpretation of that evidence was that the registered owner of the car was, in fact, the driver. I would just argue that it was equally reasonable for the officers to assume that Mr. Clapper and Mr. Duran were friends. They were friends and neighbors, and that when they brought Mr. Clapper out and he met the general description, he was the one with the light-colored shirt, that Mr. Clapper had been the driver and Mr. Duran was his passenger. Why couldn't they have followed up with Mr. Duran right away? I know they knocked on the door and no answer. But given the high-profile case that this is and some of the dubious aspects that they're very, very much aware of, why didn't they follow up? Or at least why did they wait 41 days? Well, didn't they follow up in the sense of getting the key from somebody and trying to get into the apartment and they found the key didn't work? Yes, Your Honor. I would agree on that. And I was also going to add, it's not we don't know that they didn't follow up for 41 days. We know that the case wasn't dismissed for 41 days. I just wanted to share with you that it bothers a judge to see somebody who is innocent held for 41 days under circumstances that could have been avoided. And on that point, Your Honor, I would say it bothers me, too. But I would say we have an undeveloped record because that wasn't the focus of this litigation. That was the focus of plaintiffs' belated attempt to amend his complaint and allege that Fourth Amendment malicious prosecution, due process, failure to disclose evidence to the prosecutor, claim that the court didn't allow because it was so late in the game. So we don't really know what happened in that instance. Why isn't it just a genuine tribal issue of fact about what happened at the door? You know, in summary judgment, you take the evidence and like most favorable to the non-moving party. They're different versions. Right. Why isn't that a genuine tribal issue of fact? Because in a qualified immunity analysis, Your Honor, you accept the plaintiff's version of the facts. Well, here's what the judge did. The judge initially decided this on the merits. The judge did a merits determination. And then at the very end, the last little paragraph, he says, well, and by the way, even if, you know, I'm wrong, they're entitled to qualified immunity. My understanding of the judge's order was that he accepted plaintiff's version of the facts, that plaintiff, in fact, had his security screen door open, as he testified to, that it was not wide open, as the officers claimed, and found that even on the plaintiff's version of the facts, when the plaintiff came to the door and voluntarily opened his interior wooden door, he placed himself in plain view. The officers could see that he matched the description, and they had probable cause to enter his apartment and arrest him. How did he test matching the description? The description was male, Hispanic, white shirt. This happens to be a male, but query whether he looked Hispanic or not. And he certainly wasn't wearing a white shirt. He was wearing a light-colored shirt, Your Honor. Mr. Clapper himself testified when asked what he was wearing that night. He described it interchangeably as an off-white shirt, a light-gray shirt. It was a light-colored shirt. It wasn't like he was wearing a dark. Did you, in effect, treat the word white in the description as light? I'm sorry, Your Honor? You wanted to treat the word white shirt as light shirt. I think it's close enough for purposes of probable cause. Mr. Clapper had come out wearing a striped shirt or a plaid shirt or, you know, all the different possibilities, but he came out. Suppose when they opened the door, they found him standing there wearing a black shirt. Did they have had probable cause to arrest him? Clear black shirt. And I suppose the police could say, well, he's been in here for a couple of minutes. He probably changed his shirt. That's the first thing you do when you're fleeing is change your appearance. I think that would change the mix then, Your Honor. I think you would have one less factor leaning in support of the officers being reasonable and believing that he matched the general description broadcast down. I suppose it's always very easy in a case like this to make small variations in the facts. And suppose they had said he was wearing tan shoes, they saw from above tan shoes, and he was wearing black shoes. I mean, you can find all of these things, but you've got to make some sort of an overall value judgment whether, considering all the circumstances, the police officers had a reasonable basis for thinking this was the man. I think that's exactly correct, Your Honor. And I think considering the totality of the circumstances, they did have a reasonable basis for believing they had the driver. If it's a close case, do we resolve it in favor of probable cause or against probable cause? I think if this court considers it a close case, maybe you decide the probable cause issue and move on to the second prong of qualified immunity. Were these officers clearly on notice? And I would say they were not. I think that this falls into a gray enough area where, under Cormier, they had a right to – they did not make an unlawful visual entry into his apartment. Under United States v. Pignon, the general description coupled with the close proximity and time and place were sufficient for them to believe they had probable cause to arrest him. And it's close enough. Close enough. Close enough for purposes of qualified immunity. For qualified immunity. Yes. You said decide probable cause and go on to qualified immunity. But let me ask you this. If it's a close case and there's a dispute over the facts, why doesn't that go to the jury? Because qualified immunity requires – Well, that's the bottom line inquiry on qualified immunity. That's a judge determination. I'm talking about probable cause. Well, I think in a qualified immunity analysis, Your Honor, if I'm understanding – If you take all – in qualified immunity under Katz, what you do is, you know, if there's two versions of the facts, you take the plaintiff's version. Correct. If you take the plaintiff's version here, you lose. I disagree, Your Honor. Well. Okay. But assuming – I'm not the court, so – The district court didn't do that. The district court did not take the plaintiff's version. I believe that the district court did because I think the district court analyzed the entry and the arrest under plaintiff's version. Not that he didn't do it, but under plaintiff's version, that his security screen door wasn't open, that he wasn't pressed against the wall and breathing heavily. I think the court accepted all of those things and said – all of those facts and said, even under your version, Mr. Clapper, when you opened your interior door, you did so voluntarily. It was consensual. It wasn't under badge of authority. And once you opened your interior wood door, you placed yourself in plain view, and the officers were reasonable in their belief that you matched the description that was broadcast down to them. It was reasonable for them to think you were a male Hispanic in a white shirt, and there was probable cause to arrest. So I think the court did – Well, he produced evidence at summary judgment, which, you know, disputes whether or not – what the officers could possibly see. I'd like to address that, Your Honor, if the court has concerns about it. All right. Because I know that Clapper – Mr. Clapper says that he presented substantial evidence that the officers couldn't possibly have seen into his apartment if the security screen door was closed. And I'd like to talk about that. I think everybody agrees, and I think Plaintiff himself conceded, that if the apartment was well lit, you can see through one of those security screen doors. And I would direct – That assumes his apartment was well lit. Well, yes. And let's look at the evidence on that. I would direct the Court's attention to Plaintiff's statement of undisputed fact in his motion for summary judgment. And it's in the appellate record at page 365. And one of his undisputed facts is the apartment was well lit. He says it. And in support of that statement, he relies on the testimony of Officer Ramirez, who testified in his deposition that the apartment had what he called standard lighting, but it was a small apartment, and so any light would light up the apartment. I don't think Mr. Clapper can now retreat from that original statement that he made. Was Mr. Clapper's version of the event that he opened the door all the way or that he opened it up four inches? I believe he said he opened it up all the way. All the way. So he swung it open. Yes. And I think that fits with his testimony, that he had no idea who was knocking at his door. He repeatedly said that. So he had to keep going to the door to peer out. Those were his words. He couldn't tell who it was. He could see figures in dark shirts, but he didn't know who it was, so he was looking out, asking him. They didn't pronounce themselves as police, did they? That's correct, Your Honor. They didn't say, police, open the door, please. Not according to Mr. Clapper or to the officers, nor did they have their guns drawn, as in Windsor. By Mr. Clapper's own testimony, they were knocking at the door, albeit according to him forcefully, but they hadn't announced their presence, so there was no... He said that he had no idea who it was, didn't he? That was his testimony. I heard someone knocking loudly at my door, and I thought to myself, who could it be? So I went to the door and I looked out, and I still couldn't see, so I looked a little harder. That was his testimony. Now, let me add one last... I just have one last line of questions to ask the witness. Judge O'Scanlan pointed out two things, actually. He said that he informed the officers that he had been to the store, and he had picked up some groceries and had a bag and had a receipt and could show, and their response to that was, well, we don't investigate it. It's not our policy. And then shortly, I think that same night, they learned about the driver, that the driver of the vehicle lived in the apartment, or the owner of the vehicle lived in the apartment. That's correct. Do you think they have any... It's your position the law doesn't impose upon them any obligation whatsoever? Well, I think the law is quite... To investigate before they... I think the law is quite clear that they didn't have any obligation to investigate his alibi once probable cause was established. In terms of Mr. Duran being the registered owner of the car, I think it's arguable whether that falls into the category of something that's clearly exculpatory. As I stated before, I think... Probably to investigate? I think they did investigate. I think they attempted to investigate, but... Right then and there or the next day? Did they go to the apartment? They go to the apartment that night, but the manager doesn't have a key, and they knock, and no one answers. It's not like they did absolutely nothing. They made an attempt, but they believed that Mr. Clapper was the driver because he was the one who matched the general physical description. Did they run a check on his own license to see if he had a license? I'm sorry? Did they run a check to see if he had a license? I don't know that. He didn't have a license. He didn't have a California license anymore. I believe that he did not have a California driver's license. I don't know if he had a California ID yet. I don't know if he had an identification with the DMV, and I don't know the answer to that. I mean, I think... Well, actually, I do think that they did confirm his identity because I think there was evidence in the record and plaintiff argued that at some point they determined according to some record, his DMV record or something, that he was white, and plaintiff argued that that undercut the probable cause. Thank you. Thank you, counsel. Mr. Burram, you have some reserved time. Yes, I do. I'd like to elaborate on a couple of statements that were made. First, Mr. Clapper did submit a declaration saying that after he opened the door, one of the officers announced police officer, and it was at that time the police officer said, police officer, can you open the door? He then unlocked the door. Second... Excuse me, did he... Have you said that it was a police officer who was announced before he opened the door? No, Judge Friedman. What he said was that after the rapping on the metal door, he ruminated who could this be, and then he opened the interior door fully, and he stood at a point that would be consistent with what you see in the record as T1 on page 640. This is Mr. Campos, who at the time this picture was taken, was the manager of the apartment building. And the view the officers would have had, had they been off to the side, would be the view shown in T2 on page 640. 640, 641 have these photographs, so you'll be able to see what, in fact, they did. Judge Paez made a comment that the trial court made rulings on the merit, and there's no question that he did. He found that looking at the booking photograph, he could tell that Mr. Clapper looked Hispanic, and therefore that was enough for qualified immunity, that they could have made a mistake. I would invite your attention to the declaration of Ken Brooks, which you'll find in volume two of the excerpt of record at pages 420 through 423. Brooks was a sergeant in the Los Angeles Police Department, and he went through the different communications that the police had, including running George Durant at 1014 p.m., and that officers Ponson Ramirez knew about this, and he explains why in his declaration. The record check that was done on Mr. Clapper was done at 1014. They ran him as a male white. George Durant was run as a male Hispanic. George Durant had a warrant out for his arrest. The car was not reported stolen. Ana Avila, the apartment manager, called the Los Angeles Police Department on 911, and in a tape-recorded conversation told the police, the people you are seeking ran into apartment six. Mrs. Martinez, who lived across the hall from Mr. Clapper, actually saw George Durant and Rigoberto Diaz run from one side of the building into apartment six, and she then told Ana Avila this. Ana Avila was spoken with by Los Angeles police officers that very night, and she reconfirmed to them in her apartment what she had told the Los Angeles police dispatcher when she made the 911 call. Part of why we so strenuously seek to amend the complaint to go after these people on the malicious prosecution is that when we got the DA's file through a subpoena pursuant to a protective order, there was all sorts of information in there that we never got from the city that shows the connivance and the dishonesty of the people that Mr. Clapper is trying to hold accountable here. The Pinion case is a case that the defense highlighted, and Pinion includes the statement that a general description without more is insufficient. Going back to what Judge Paez was saying and Judge Friedman also, if this is a dispute on the issues, doesn't it go to the jury? Pinion was a case where the fellow was doing very suspicious things, claimed that he had been running through backyards away from black people. I'm almost out of time. Mr. Clapper, according to his version, was not running away from anybody. He wasn't doing anything suspicious. It was totally cooperative. Thank you. Thank you, Counsel. The case just argued will be submitted for decision, and the panel will adjourn.
judges: Friedman, O'scannlain, Paez